# Richmond.

## TOY RASNAKE AND ROSS BUMGARDNER V. COMMONWEALTH.

### January 18, 1923.

1. HOMICIDE—*Evidence—Reckless State of Mind of Accused—Case at Bar.*—
   In the instant case the court permitted a witness to testify that a
   boy was screaming and crying as he came up the road from the place
   at which he had just met the accused just prior to the homicide. The
   boy himself had testified that he had met the accused and accused
   had asked him where deceased was and had terrorized him with a
   pistol. Accused denied this mistreatment of the boy.

   *Held:* That this evidence was admissible as tending to show that the
   condition of the mind of the accused, immediately preceding the kill-
   ing, was one which displayed hearts "devoid of social duty and
   fatally bent on mischief."

2. HOMICIDE—*Evidence—Conduct on Part of Deceased to Show His Dangerous
   Character—Case at Bar.*—In the instant case, a prosecution for homi-
   cide, the court did not err in excluding evidence to the effect that a
   short time before the killing a witness met deceased and another, and
   upon the witness asking the companion of the deceased of the where-
   abouts of a third person, deceased turned angrily upon him demand-
   ing with oaths what business he had with the third party and threat-
   ened the witness, the trial court having already admitted evidence to
   the effect that deceased was a quick, high-tempered, dangerous man.

3. HOMICIDE—*Evidence—Self-Defense—Particular Instances of Violent Con-
   duct on Part of Deceased Disconnected with the Homicide—Discretion of
   Court.*—While by reason and authority it appears that particular
   instances of violent conduct on the part of deceased, disconnected
   with the homicide or with the occasion upon which the homicide was
   committed, although unknown to the accused at the time of the
   homicide, are admissible in evidence in behalf of the accused upon
   the claim of self-defense, where there is other evidence tending to
   support the claim of self-defense, yet the number of such instances of
   violent conduct, which will be permitted to be introduced in evi-
   dence, is to be controlled by the discretion of the trial court.

4. HOMICIDE—*Evidence—Previous Difficulty and Reconciliation with De-
   ceased—Case at Bar.*—In a prosecution for homicide the court did not

err in refusing to allow accused to add to his testimony that after a previous difficulty with deceased, deceased told the mother of accused that he did not want any hard thoughts about the incident, and that if he had not been drunk it would not have occurred, and in refusing to allow the mother of accused to testify to the same effect. The court merely declined to allow the witnesses to go into details of the alleged reconciliation, but did allow testimony that the reconciliation took place.

5. Homicide—*Character of Deceased—Modification of Question by Court— Case at Bar.*—In the instant case a witness was asked if he knew the general reputation of deceased "in the community where he lived for being a quick-tempered, dangerous man?" Upon objection to the question the court said: "General reputation as being a dangerous, overbearing, quarrelsome man." To this amendment accused excepted, whereupon the court said: "If you know his general reputation, state it."

Held: No error as the same testimony was given by the witness as if the question had remained and he had answered it in its original form. Moreover, three other witnesses for the accused were asked and answered the precise question under consideration in its original form.

6. Homicide—*Character of Deceased—Keeping Lewd Women—Evidence or Reputation to Prove Particular Facts.*—In a prosecution for homicide it was no error for the court to refuse to allow witnesses to answer a question as to whether they knew the general reputation of deceased in the community in which he lived for being a man who visited and kept on his premises lewd women for immoral purposes. Particular or specific facts, such as those sought to be elicited by the question, cannot be proved by reputation evidence.

7. Homicide—*Witnesses—Illicit Relations of Witness with Deceased—Bias of Witness.*—In a prosecution for homicide the existence of illicit relations between a witness and deceased could be shown as evidence tending to show bias in her testimony in favor of the prosecution. Such evidence is admissible, whether elicited upon the examination or cross-examination of the witness, and where the witness denies the existence of the relationship in question, it is the proper subject of independent testimony as tending to show bias on the part of the witness.

8. Homicide—*Instructions—Relationship of Witnesses to Defendants and the Deceased—Singling Out Illicit Relationships—Case at Bar.*—In the instant case, a prosecution for homicide, the court instructed the jury that, in determining the weight to be given to the testimony of the different witnesses in the case, the jury should consider the relationship of the witnesses to the defendants and the deceased, if the same was proved.

*Held:* That the instruction thus given was sufficiently specific to direct the attention of the jury to the consideration of the evidence upon the subject of the illicit relations of some of the witnesses with deceased, and that to have singled out, as the accused asked, the illicit relations of these witnesses with the deceased would have given undue emphasis to the effect of that kind of relationship.

9. Homicide—*Aiders and Abettors—Instructions—Principal in the Second Degree—Consideration of Facts and Declarations of Accused.*—In a prosecution for homicide an instruction that in considering whether accused was a principal in the second degree present, aiding, abetting, counseling, advising, or consenting to the killing of deceased, the jury might consider all the facts and declarations of accused at the time of the killing both before and after the killing, and if they believe from the whole evidence that he was aiding, consenting, and abetting in the crime, then he is guilty.

*Held:* No error, where all the instructions in the case, read together, fully and accurately instructed the jury upon the subject of what conduct on the part of defendant constituted him an aider and abettor in the commission of the crime.

10. Homicide—*Aiders and Abettors—Instructions—Principal in the Second Degree.*—In the instant case, a prosecution for homicide, the court instructed the jury that if they believed that one R. willfully, maliciously, deliberately, and premeditatedly shot and killed deceased and that the defendant was present, aiding, abetting, counseling, advising, or consenting to the crime, then both R. and defendant were equally guilty of murder in the first degree.

*Held:* No error, where all the instructions in the case, read together, fully and accurately instructed the jury upon the subject of what conduct on the part of defendant constituted him an aider and abettor in the commission of the crime.

11. Homicide—*Instructions—Aider and Abettor—Presence and Consent Alone.*—In the instant case, a prosecution for homicide, the accused requested the court to instruct the jury that mere presence and consent alone were not sufficient to constitute an aider or abettor.

*Held:* That the refusal of the court to give this instruction was not error because it was not in accord with the evidence, in its assumption that there was no evidence beyond that of the mere presence and consent of defendant.

12. Aiders and Abettors—*What Constitutes—Criminal Intent.*—To constitute an aider and abettor it is essential that the aider and abettor should share the criminal intent of the principal or party who committed the offense.

13. Homicide—*Aiders and Abettors—Principals in the First and Second Degrees.*—Principals in the first degree in every murder or other crime are those who are the actors or actual perpetrators of the crime—

those who are the immediate perpetrators of the act; principals in the second degree are those who did not with their own hands commit the act, but were present aiding and abetting it. It is not necessary in order to make a person a principal in the second degree that he actually participate in the commission of the crime. The test as to whether or not he is principal in the second degree is, was he encouraging, inciting, or in some manner offering aid or consent to the crime? A person present lending countenance, or otherwise aiding while another does the act, is principal in the second degree, and liable to the same punishment as if he were principal in the first degree and actually committed the crime.

14. AIDERS AND ABETTORS—*Presence and Consent Alone.*—Mere presence and consent alone are not sufficient to constitute one an aider and abettor in the commission of a crime. But where the evidence shows that two or more persons were together in execution of a common plan or purpose which is unlawful, the evidence of the common plan shows the criminal intent of them all; the overt act of one in being present ready to assist if needed while another commits the crime, evidences that both the will and deed of the one so present contributes to the commission of the crime, although he takes no active part at the time of the final deed.

15. HOMICIDE—*Motive—Jealousy.*—In a prosecution for homicide the fact that accused knew that deceased stood in the way of their continued intercourse with certain women was a sufficient motive for the crime.

16. HOMICIDE—*Witnesses—Character of Witnesses—Credibility of Witnesses a Question for Jury.*—In a prosecution for homicide, notwithstanding that the jury considered that the character of certain witnesses for chastity was bad, still the jury was warranted in believing that they told the truth touching the material facts to which they testified. Their credibility was a matter solely within the province of the jury.

17. HOMICIDE—*Witnesses—Impeachment—Question for Jury.*—Whether a witness before the trial gave a different account of the killing from that to which she testified, and how far it affected the reliance to be placed on her testimony, was for the jury to determine.

18. HOMICIDE—*Witnesses—Incredible Facts—Question for Jury.*—In the instant case it was contended that the testimony for the accused tended strongly to show that improper relations existed between the deceased and a witness; that she was a biased witness, that the time and place of the killing rendered it incredible that it could have occurred as she said it did, and that another detail of her account was incredible. There was nothing physically impossible, however, in her account, and she was corroborated by some of the physical facts. The testimony for the accused was also in accord with these physical facts.

*Held:* That the truth depended upon the credibility of the witnesses upon which the verdict of the jury is conclusive.

Error to a judgment of the Circuit Court of Russell county.

*Affirmed.*

The accused, Rasnake and Bumgardner, were jointly tried upon the charge of the murder of Rufus Sutherland, who was shot and killed by Rasnake on November 3, 1921. There was a verdict finding them both guilty of murder in the first degree and fixing the punishment of Rasnake at thirty years and of Bumgardner at twenty years confinement in the penitentiary. The judgment under review was entered accordingly.

From the evidence for the Commonwealth and for the accused, upon the elimination of the testimony of and for the accused where it is in conflict with that for the Commonwealth, the following (with reference to some of the testimony of and for the accused, which may or may not have been true in whole or in part) are the material facts:

Rufus Sutherland, the deceased, was about 45 years of age at the time he was killed, and was a strong, active, robust man, weighing from 180 to 200 pounds. He was an unmarried man. Maud Trivett and her half-sister, Lina Sexton, or Maude Sexton, as sometimes called, both lewd and unchaste women, lived about a mile and a quarter from the home of and on land owned or controlled by the deceased. The Trivett woman was supported (house furnished, clothes bought and grocery bills paid), and she was visited, by the deceased, as a mistress, according to the testimony of the accused, Rasnake. The accused, Bumgardner, spent the night before the homicide in bed with this woman, and had been visiting her before, for just how long is not disclosed by the evidence. The accused, Rasnake, spent the night before the homicide in bed with the Sexton

woman; had been visiting her before for more than a year; and she had a child which the evidence tended to show was his. A witness for the accused, Worley Smith, testified to the effect that about a year before the homicide the witness and the brother of the accused, Bumgardner, chanced to be passing the house occupied by the Trivett and Sexton women, and that the deceased came up to them and said: "Why don't you go in, boys?"; witness said that he did not want to go in; whereupon the deceased said: "You thought you would wait until night to go in, did you?" and added, in an angry manner, that "somebody (had) been laying around in his barns," and that "he was going to get Toy and Ross" (the accused Toy Rasnake and Ross Bumgardner), and "said that he was not going to stop with Toy and Ross, but was going to make a general clean up of all of them.  *    *    All the boys. He said if he could not stop them one way he would another."

After spending the night before the homicide as aforesaid, the accused both got out about day-break and went to the near-by home of Mrs. Sutherland, a widow (variously spoken of in the record as Miss Sutherland, Mrs. Sutherland, Gal Sutherland and Gal Artrip, her maiden name), at whose house and with whom the accused and the Trivett and Sexton women had spent the forepart of the night before in a drunken carousal. The accused both went in the house of Mrs. Sutherland, about day-break of the morning of the day of the homicide, and asked her to get breakfast for them, which she agreed to do. While she was getting breakfast ready they stated that they were going down to the store to get some cigarettes, and both went down the road about a quarter of a mile to South Clinchfield, where there were several stores. Both of the accused testify that, previously to their going to South Clinchfield that morn-

ing, Rasnake asked Bumgardner to go with him down to the deceased's home that day and that Bumgardner consented to do so.   The testimony of Rasnake in this particular was as follows: "I asked him (Bumgardner) to go down to Mr. Sutherland's with me after a sheep and he said he would."   The testimony of Bumgardner as to this was as follows:

"Q. While you were gone to get the cigarettes did Toy say anything to you about going after a sheep?

"A. Yes, he said, going down there, he wanted me to go with him to Mr. Sutherland's that day to get a sheep."

On their arriving at South Clinchfield, Rasnake went into the store of a Mr. Artrip (Bumgardner not going with him into the store) and bought a box of cigarettes; he next asked Mr. Artrip to lend him a pistol and he borrowed from Mr. Artrip a 32-special, Smith & Wesson pistol, with some cartridges in it (whether loaded all around is not definitely shown).   Rasnake then went into a Mr. Edmunds' store, accompanied by Bumgardner, and Rasnake, in the presence of Bumgardner, borrowed a "32 x 20" pistol of Mr. Edmunds; and Rasnake stated to Mr. Edmunds, as the reason for wanting the pistol, "something about him and Ross wanting to take some liquor somewhere," according to the testimony of Mr. Edmunds.   This pistol was loaded.   Rasnake also bought, at another store (Grizzle's), twenty-five cents worth of cartridges for the pistols.

Bumgardner testified that he knew that Rasnake got two pistols at South Clinchfield, but he did not know where he got them.   That he (Bumgardner) was in the Edmunds' store with Rasnake, but did not see the borrowing of the pistol from Mr. Edmunds, or hear the conversation between Rasnake and Edmunds about it; that while they were talking he (Bumgardner) thinks

he walked back into the back room.    That going back up the road to Mrs. Sutherland's Rasnake gave him (Bumgardner) one of the pistols and said:    " 'I want you to go over there with me,' and reached me the gun, says, 'We will go over there and get it.' "    Then followed the following questions and answers in Bumgardner's testimony:

"Q.  Over where?

"A.  To Mr. Sutherland's.

"Q.  What they call the 'sink-holes?'

"A.  He was going over to Rufus Sutherland's to see about a sheep, I think the sheep was in the sink-holes, I don't know exactly where they were.    *    *    *

"Q.  You were going over there to buy a sheep of him?

"A.  Going over there to see Mr. Sutherland to get a sheep if we could find it and if he could (not) was aiming to buy one from Mr. Sutherland.

"Q.  If you could not find what?

"A.  The two sheep his father had over at Mr. Sutherland's or somewhere over there.

"Q.  You tell the jury that you understood that his father had two sheep over there at Rufus Sutherland's?

"A.  Yes; had two sheep with his.

"Q.  Over about his place?

"A.  Somewhere over there.

"Q.  And you were going over there to get the sheep?

"A.  Going over there to see Rufus and if he could not find them buy one.    *    *    That is what he said.

"Q.  That was your understanding?

"A.  Yes, sir.

"Q.  Where did you understand those sheep were?

"A.  They were with Rufus' sheep, I didn't know where they were.

"Q.  They were over there where you were going?

"A.  They were over there somewhere.    *    *    He

was going to see Mr. Sutherland before he hunted the
sheep.

"Q.  Why?

"A.  (Toy's) Mother told him to go and see Mr. Suth-
erland before he went in among the sheep."

The accused both returned from South Clinchfield to
Mrs. Sutherland's, ate breakfast and stayed there until
about ten o'clock a. m.   While they were there the
Trivett and Sexton women came, and these women,
Mrs. Sutherland and the accused, together drank nearly
a quart of liquor, according to the testimony of Bum-
gardner; but not sufficient, as the other evidence
showed, to affect their locomotion or their full con-
sciousness of what they were doing.

The accused (who were first-cousins) then went to
their near-by homes and changed their clothes, putting
on their working clothes, to go on the hunt for the
sheep, as they testify.   They stopped first at the home
of Bumgardner, Rasnake waiting for him until he
changed his clothes.   They then went on to Rasnake's
father's (three or four hundred yards from Bumgard-
ner's house), where Rasnake lived, where he changed
his clothes.   While there the mother of Rasnake told
the latter, in the presence and hearing of Bumgardner,
that before they went on the hunt for the sheep (which
was one of two sheep belonging to Rasnake's father
which had become wild, and was thought by both of
the accused to be in a section known as the "sink-holes"
and running with some sheep belonging to the de-
ceased), he had best first go and see the deceased about
it.   And the testimony of both of the accused was such
that the jury were warranted in believing that, so far
as going for the sheep was concerned, up to this time,
the idea of first seeing the deceased had in truth not oc-
curred to either of the accused; that hunting the wild

sheep belonging to Rasnake's father, and the killing of one of them to obtain mutton, had been talked of in the Rasnake household during a few days preceding the homicide; but that involved merely the going to the "sink-holes" section and there hunting for and shooting one of such sheep, and did not contemplate first interviewing the deceased about it.   On this subject the accused, Rasnake, testified as follows:

"Q. You said you decided to get a sheep.   Where was the sheep that you had in mind that you would get?

"A. They were over in the sink-holes.

"Q. Whose sheep were they over there?

"A. They were Mr. Sutherland's sheep, and my father had two with his.

"Q. Your father had two that had gotten in with Sutherland's sheep?

"A. Yes, sir.

"Q. When you went home that morning, after you had been down with the Sexton women at Gal Sutherland's or Gal Artrip's, why didn't you just go on over there and get the sheep without going to see Mr. Sutherland about it?

"A. My mother told me to go and see Mr. Sutherland before I went over there amongst the sheep after I went home.

"Q. Before she had told you this, what was your intention and purpose?

"A. I was aiming to go over there and hunt for them and see if I could find them.

"Q. Did you get any pistols that morning?

"A. Yes, sir.

"Q. From whom did you get the pistols and how many?

"A. I got a pistol from Mr. Artrip and one from Mr. Edmunds.

"Q. What did you want with the pistols?

"A. I borrowed the pistols with the intention of going over there and getting the sheep. I knew if we found them we could not catch the sheep and we would have to shoot him."

There was other testimony of Rasnake, of Bumgardner, and of other witnesses on the same subject, tending to establish the same facts.

It, however, developed in the evidence, and was admitted by both of the accused in their testimony, that the "sink-holes" section was in the opposite direction from their homes from the direction therefrom of the home of the deceased, and that the going on the hunt for the sheep, but for the request of Mrs. Rasnake that the deceased be first seen about it, would have taken them in an opposite direction from the home of the deceased.

The testimony of Mrs. Rasnake on the subject of her aforesaid suggestion was as follows:

"Q. On the day that Rufus Sutherland was killed, did Toy Rasnake and Ross Bumgardner come to your home?

"A. Yes; they came there.

   *     *     *

"Q. Did you tell or did Toy say anything to you that day when he came home about going and getting a mutton?

   *     *     *

"A. He said he heard the sheep were in the sink and said 'I am going to kill one,' and I says: 'Don't go and kill one until you see Mr. Sutherland, it would look the nicest for you to go and see him first.'

"Q. What did he say?

"A. He said 'well,' and started on that way."

Thereupon Rasnake and Bumgardner set out for the home of the deceased, a distance of about a mile, as ap-

proximately stated by Rasnake. On their way they met a witness who told them (what the jury were warranted by the evidence in believing they already knew) that the deceased had no sheep at his home, and had had none on the place for two years or more, but had some which had gone wild and if he still had any they were over in the "sink-holes" section. They (Rasnake and Bumgardner), however, went on to the home of the deceased and going up to the front of the residence called. The servant of the deceased, Maude Owens, came to the door. They asked where the deceased was. Maude Owens told them she supposed he was across the creek helping haul corn. Thereupon their conduct, according to the testimony of this woman, was as follows:

"* * * and they maybe again asked me where he was at; anyhow, the dog came walking up through the yard and I think I told them he would not bite them or bother them nor nothing, the dog walked around in the yard and laid there a few minutes, I think maybe they played a little with him, it was my dog, and Toy tried to buy him, and I told him I did not want to part with him; he was good to run the cows and I didn't want to part with him, and the dog came back on the steps; I was standing in the door; climbed up the steps and kindly set down; I had my feet stuck out from the door, and Toy says 'Stand back, I am going to shoot the dog,' and I pulled my feet back; I didn't think he was going to shoot him until he drew the gun there right in front of me, and I says, you are not going to kill my dog, and he shot the dog, and my little boy commenced screaming and crying about the dog, and Toy stepped around the front of the door and drew the gun on him, the boy, and told him if he did not hush he was going to shoot him, and I grabbed the child up and took him in

the kitchen, I was afraid he might shoot him, and I took him back to the upper end of the kitchen by the table. I kept him there a few minutes and walked back to the stove to see if I could see the boys; I could not see them and I went back through the house and looked out and they were going down below the yard fence at the coal house, and I watched them down to the barn, and they got down to the barn and commence shooting at the door, the door was open, wide open, and some slats across the door, and they commence shooting in at the door, to the best of my knowledge right in the barn, the barn was full of hay and corn plumb up to the loft, and went on down.

"Q. How many times did they shoot at the barn?

"A. I don't know how many times. They went on down a little piece from there and shot a few shots down there, I don't know how many, and went on down the road out of my sight. That is as far as I can tell.

"Q. Did you see along about that time, or a few minutes afterwards, a little boy by the name of Perry Wagner?

"A. Yes, sir.

"Q. Where did you see him?

"A. Coming up the road.

"Q. Where did he come from?

"A. He came from down at his home.

"Q. How long after these men went out of your sight?

"A. Not but a few minutes.

"Q. What was he doing?

"A. He was screaming and crying."

The boy, Perry Wagner, testified that he met Rasnake and Bumgardner a short distance after they had passed the barn at the branch; that they asked him where the deceased was; that he told them that the last time he saw the deceased he was digging on the road;

that Rasnake said "not to tell him no lie," and said he would kill the witness, and drew his pistol from his pocket and "threw it on" the witness.    That they then left the witness and went on down the road towards the home of the witness (being the home of his father, Bige Wagner, which was on land owned or under the control of the deceased), a short distance (less than 200 yards) away.

The accused both walked up to the deceased, where he stood in the road near Wagner's house, where the deceased was at work on the road.    The only eye-witnesses of what then occurred, besides the deceased, were Mrs. Ida Wagner, the wife of Bige Wagner, her servant, Ellie Coffee (who ran away before the shooting, and so did not see or testify to all that occurred) and Rasnake and Bumgardner.

Mrs. Wagner testified that she came out on the porch of the Wagner home when she heard the shots fired up about the barn, and that while she stood there Rasnake and Bumgardner came on down the road and up to where the deceased had been at work; that the deceased stood with his pick resting on the ground and his hand resting on its handle; that Rasnake and Bumgardner walked up and "spoke a few words right quick" after they walked up; that she could not hear what was said; and that Rasnake "threw" his pistol on the deceased, when witness "hollered to him not to do that, come on away," and that the deceased was talking. to him, too; that the deceased told him "to go on and not to do that way;" that she could not understand what Rasnake was saying, but heard him give the deceased "the lie over something;" that she did not know what the deceased said; that when she told Rasnake "not to do that, to come on away and not do that," he paid no attention to her, but "threw" the pistol on the deceased again; that

when Rasnake did that she "called to them to go on," and the deceased was calling to them too, and said: "Go on, don't do that way, what's the matter with you?" that "then they shook hands," Rasnake and the deceased, and that she "thought they were going to make friends when they done that;" but that Rasnake "then threw the gun (pistol) on him again and told him to step up on the bank;" that the deceased "stepped up on the bank and says 'I am up here,' rubbed his hands down his side that way (indicating), and said: 'You see I have nothing,' and that when the deceased did that" Rasnake raised his pistol and shot and killed the deceased; that during all this time Bumgardner was standing by Rasnake's side, with his hands in his pockets, and that she didn't hear or see Bumgardner say or do anything. That the deceased fell where he was shot, on the bank beside the road; that he raised up on his elbow after he fell and motioned to the witness "with his left fingers" to come to him, but Rasnake "threw" his pistol on the witness and said: "You go back in the house," which she did. That the deceased did not do or offer to do anything to either of the accused before he was shot. That when he started to step up on the bank he turned the pick loose and it fell at the rock where he was digging.

Ellie Coffee's testimony was, in all material particulars, to the same effect as that of Mrs. Wagner up to the time when she said she had seen Rasnake point his pistol at the deceased twice. Ellie Coffee testified that at that time she became so frightened that she ran away and saw no more of what occurred.

Rasnake and Bumgardner, in their testimony, both denied all of the reckless conduct on their part just preceding the homicide, which is attributed to them by the witnesses Maude Owens and Perry Wagner. They

both testified that Rasnake shot the dog in self-defense, as the dog rushed at him and was about to bite him, as he started to go out of the front yard gate.   They denied that Rasnake pointed his pistol at the child of Maude Owens, or at the boy, Perry Wagner, or that he threatened to kill the latter.   They denied all shooting on the premises of the deceased prior to the homicide, except they said that Bumgardner shot two or three times, in the ground, just after they passed the barn.

Rasnake's testimony about the homicide is to the effect that when he and Bumgardner came up to the deceased, Rasnake told the deceased that he wanted to get a sheep from him for mutton and that thereupon the deceased, without any other provocation, with an oath, made a murderous assault upon Rasnake with the pick; that Rasnake dodged the first stroke of the pick; that the deceased came after him again with the pick uplifted, when Rasnake shot the deceased in self-defense.   On this subject Rasnake testified as follows:

"*   *   *   I asked him or told him that I wanted to get a sheep of him for a mutton, and he says 'Damn you, I ain't got no sheep for you,' and struck at me.

"Mr. Wilson: Wait one minute there.   He said what?

"The witness: He said 'Damn you, I ain't got no sheep for you.'

"Mr. Wilson: Go ahead.

"A. (Cont'd) He had a pick in his hand and he struck at me with the pick, and I dodged him and run down on the lower side of the road, big road against the fence, a rail fence, and he says 'Damn you, you been meddling in my business', and he came at me again with it, and that is when I shot him."

Rasnake further testified, in great detail, to what occurred from day-break of the morning of the homicide

up to and including the killing and afterwards, until he and Bumgardner separated, when the latter was arrested that afternoon back at Mrs. Sutherland's; and the testimony of Bumgardner is almost word for word precisely the same about every material occurrence.

The testimony of Rasnake and Bumgardner was that Bumgardner took no part in the whole affair, except that the jury were warranted by their testimony in believing that whatever was the plan and purpose of Rasnake, which was conceived in the early morning of the day of the homicide, it was concurred in by Bumgardner and was the common plan and purpose of the two; and that Bumgardner was armed, accompanied Rasnake, took part in the reckless conduct and was present at the shooting of the deceased, as aforesaid, with the intent to aid and assist Rasnake in the execution of the common plan and purpose, whatever it was, if Rasnake had needed any asssistance.

Both of the accused testified that when the deceased was shot and fell, neither tarried to see if he was living or dead. That they returned to Mrs. Sutherland's after the homicide, by a different route from that followed in going to the scene of it, passing a number of houses and seeing a number of people on the way—one of them a local physician—that they gave the information to none, until they got to Mrs. Sutherland's, that the deceased had been shot; and on their route back to Mrs. Sutherland's they stopped at a garage in Clinchfield where they knew some whiskey was, which they testify did not belong to them, and got three quarts of it, in quart jars, Rasnake carrying one of the jars and Bumgardner the other two; that as the physician above mentioned passed them in the road Rasnake called to him asking if he wanted a drink, waiving a jar of whiskey at him.    It also appeared from the testimony for

the Commonwealth, that later, a boy, who was a nephew of the deceased, passed them as they and the Sexton woman were together where the road forks near Mrs. Sutherland's, and that Rasnake joked with and offered the boy a drink. They then went on to Mrs. Sutherland's.

As the accused arrived at Mrs. Sutherland's, following the homicide, an officer and *posse*, in pursuit, were in sight. Rasnake passed through the house of Mrs. Sutherland, went out the back way and made his escape, temporarily, up the mountain. The officer arrested Bumgardner in Mrs. Sutherland's house. The officer had been told that Bumgardner did the shooting, so he did not pursue Rasnake. He, indeed, called to Rasnake to the effect that he was not after him, that Bumgardner was the one that had done the killing. On being arrested, Bumgardner first denied all knowledge of the whereabouts of Rasnake or that he had seen him that day. It was then that the officer saw Rasnake going up the mountain, and made an exclamation, in the presence of Bumgardner, showing that he saw Rasnake. Later, Bumgardner stated to the officer in charge of him that he was sorry he had lied in the statements about Rasnake, and added, "Toy killed him, I did not have a thing to do with it; Toy killed him."

Rasnake, after going up on the mountain, in a short time went on home and gave himself into custody. Thereupon, as he "started down the road," Rasnake said that he "had it to do;" that he "was going down the road and met this man" (deceased) "in the road and this fellow made an attempt to draw his gun and he beat him to it."

Other evidence is referred to in the opinion.

*O. M. Vicars* and *Bird & Lively*, for the plaintiff in error.

*John R. Saunders, Attorney-General, J. D. Hank, Jr., Assistant Attorney-General,* and *Leon M. Bazile, Second Assistant Attorney-General,* for the Commonwealth.

Sims, J., after making the foregoing statement, delivered the opinion of the court.

There are a number of assignments of error. The questions presented thereby, so far as deemed material, will be disposed of in their order as stated below.

[1] 1. Did the trial court err in admitting in evidence the statement of Maude Owens that the boy Perry Wagner "was screaming and crying" as he came up the road from the place at which he had just met the accused, Rasnake and Bumgardner?

The question must be answered in the negative.

It is urged in behalf of the accused that this testimony "left the jury free to assume that this child, who had come from the direction in which petitioners had gone, had been mistreated by petitioners in some way." That—"it tends to prove nothing relevant to the case * * ."

The mistreatment of the boy, which this testimony tended to prove, was that testified to by the boy and denied by both of the accused. It was a part of their wanton and reckless conduct, which tended to show that their condition of mind, immediately preceding the killing, was one which displayed hearts "devoid of social duty and fatally bent on mischief"—(a very ancient definition of a condition of mind which evidences the existence of malice). This evidence was therefore relevant and properly admissible.

In *Muscoe's Case,* 87 Va. 460, 12 S. E. 790, the trial court permitted a witness to testify that shortly before the homicide the accused said to the witness, in parting

from him: "Buster, I feel hot; I feel like I could shoot a man and make him jump so high before he touches the ground" (indicating the height by his hand), and—"Don't tell me to take care of myself.   Tell the people that I pass by to take care of themselves."    This court, in holding that there was no error committed in the admission of such testimony in evidence, said this: "We are of opinion that this testimony was properly admitted.    Coming, as it did, almost immediately before the killing, it shed light upon the condition of the prisoner.    It may not be admissible strictly as evidence of intention or of threats, but it certainly shows that the prisoner was in a reckless frame of mind and ready to use the weapon with which he was armed upon none or the most trifling provocation."   Citing a number of authorities.

[2, 3] 2. Did the court err in refusing to admit in evidence the testimony of one Caney Puckett and of one Jake Robinett, to the effect that a short time before the deceased, Rufus Sutherland, was killed, Puckett was on his way to the home of Bige Wagner (which, as aforesaid, was on the land owned or controlled by the deceased) and met the deceased and Robinett, and asked Robinett if he had seen anything of Mr. Wagner that morning; whereupon the deceased turned, in an angry manner, upon Puckett, and said: "What in the hell do you want to know where Bige Wagner is?" and, with an oath, asked him what his business with Wagner was?    That thereupon Puckett said that he wanted to see Mr. Wagner about buying some hogs; whereupon the deceased, with an oath, told Puckett he had better get out of that hollow, that he had no business there, that if he didn't go deceased would put him in jail, or words to that effect.    That thereupon Puckett left.

The question must be answered in the negative.

The authorities are not in harmony upon the question whether particular instances of violent conduct on the part of the deceased, disconnected with the homicide or with the occasion on which the homicide was committed, is admissible in evidence in behalf of the accused upon the claim of self-defense.    The authorities are, for the most part, harmonious in the holding that, under a claim of self-defense, where the necessity of the accused's conduct is to be judged by the facts as they reasonably appeared to him, he may give in· evidence *whatever he knew* of the character, threats and other prior conduct of the deceased, which may tend to show that under the circumstances of the homicide the deceased might reasonably have been expected to act as the accused claims that he did.    2 Bish. New Cr. Proc. (4th ed.) sec. 610; *State* v. *Hardin* (W. Va.), 112 S. E. at p. 402, and authorities cited; *Poer* v. *State* (Tex. Cr. App.), 67 S. W. 500.    But Mr. Bishop, in the learned work just cited, in section 611, says this: "What was unknown to the defendant cannot be thus shown; because it is impossible he should have acted upon it."    Mr. Wigmore, however, takes the position (which is strongly supported in reason and, as he shows, is also supported by an increasing number of the decisions) that the kind of evidence under consideration is admissible when there is other evidence tending to support the claim of self-defense, on the further and distinct ground that it tends to show "what the deceased probably did."    That for this reason such evidence is, in such case, admissible, although unknown to the accused at the time of the homicide. 1 Wigmore on Ev. secs. 198 and 63. See also to the same effect *State* v. *Waldron*, 71 W. Va. 1, 75 S. E. 559.    But, as laid down by Mr. Wigmore, the number of such instances of violent conduct, which will be permitted to be introduced in evidence, is to be con-

trolled by the discretion of the trial court. And, in reason, this must be so; for otherwise the trial may be unduly prolonged and the issues in the particular case may be too much confused by testimony concerning matters which are chiefly collateral and are only admissible as having what, after all, is but a remote bearing on the issue directly involved, namely, what was the conduct of the deceased at the time of the homicide. Upon the admissibility of such evidence as that in question and concerning the discretion of the court to control the number of instances admitted in evidence, in 1 Wigmore on Ev., sec. 198, *supra*, this is said: "When the turbulent character of the deceased, in a prosecution for homicide, is relevant (under the principle of section 63 *ante*), there is no substantial reason against evidencing the character by particular instances of violent or quarrelsome conduct. Such instances may be very significant; their number can be controlled by the trial court's discretion;   *   *   *   ."

The trial court admitted in evidence testimony of the accused, Rasnake, that he knew that the deceased was a quick, high-tempered, dangerous man, and had known and heard of his striking other people suddenly; that he had heard of his striking the accused, Bumgardner; that the deceased and Mr. Alfred Johnson had a fight once. The court admitted in evidence the testimony of the accused, Bumgardner, that the deceased knocked him "in the head once with a gun;" that the deceased had the general reputation of being a very dangerous man. The court also admitted in evidence the testimony of A. L. Grizzle, a witness for the accused, that the deceased would "hit you all right" when one "didn't know" he was going to do it, or "had never said a word" to justify it; that the witness knew of some people whom the deceased had done "that way;" stating that the

deceased struck Mr. A. B. Kiser; that witness saw the deceased "throw a rock one day, without any provocation at all," at witness' brother; that these instances he knew of his own knowledge; that witness had heard of others, some of which he could remember and others he could not; that the deceased shot a dog of an old gentleman whose name witness could not remember; that the deceased was himself shot by a "Gibson boy;" that witness heard of the deceased attacking H. P. Laforce. The court permitted Jake Robinett, a witness for the accused, to testify that the general reputation of the deceased was that he would strike one without apparent provocation, and, on cross-examination, to testify that witness was then at work with a man, Tom Fletcher, who claimed that the deceased "knocked him in the head with a rock when he did not do anything to him;" that A. B. Kiser told witness the same thing; that "a long time ago" (12 or 13 years as appears from another part of the testimony) witness "met some fellows who had been in a play over there" (at Clinchfield) "one night and five or six in their bunch  *  *  all had their heads pasted up with tape and things and (witness) began asking who hit them and they said Rufus Sutherland hit them with a poker and a shovel, every man (witness) asked;" that Ellis Artrip was one of these parties. The court also admitted the testimony of Worley Smith, mentioned in the statement preceding this opinion.

In view of the admission of all of such testimony we think there was no abuse of the discretion of the court in the refusal to admit the additional testimony concerning the Puckett incident in question. It would have been preferable for the court to have admitted in evidence the incident in question and to have excluded some of the testimony as to other incidents of the tur-

bulent conduct of the deceased which were more remote in time; but in view of the evidence admitted, which is above mentioned, and other evidence admitted as to the character of the deceased existing at the time of the homicide, which will be presently mentioned, we think the record shows that there is no probability that either of the accused were injured by the non-admission of the evidence in question; and, hence, in no aspect can we consider the action of the court in refusing to admit it as reversible error.

· [4] 3. Did the court err in refusing to allow the accused, Bumgardner, to add to his testimony, which stated the fact that the deceased had "knocked him in the head once with a gun," the further testimony that, subsequently, the deceased told witness' mother to tell his father that deceased did not want any hard thoughts about the incident; that he had been drinking when it occurred; that it was "a little drunken racket and that if he had not been drunk" it would not have occurred. And did the court err in refusing to allow the mother of the accused to testify to the same effect?

The questions must be answered in the negative.

The court merely declined to allow these witnesses to go into the details of the alleged reconciliation, but did allow Bumgardner to testify that the incident occurred . about three years before the trial and that about a month after the incident he became very friendly with the deceased and that that relation continued up to the time of the homicide. The accused did not offer the mother's testimony to these facts; but under the ruling of the court could have done so. Hence, as the accused either got the benefit, or could have done so, of the substance of all of the testimony in question which was excluded, there was no error in the action of the court excluding the details of it.

[5] 4. Did the court err in changing the form of a question to one of the witnesses for the defense, as will appear from the following:

The question was:

"Mr. Grizzle, do you know the general reputation of Rufus Sutherland in the community where he lived for being a quick-tempered, dangerous man?"

To which question the Commonwealth's attorney objected, and thereupon the court said:

"General reputation as being a dangerous, overbearing, quarrelsome man."

To this amendment of the question the accused, by counsel, excepted; whereupon the court said:

"If you know his general reputation state it."

The question must be answered in the negative for the reason that the same testimony was given by the witness as if the question had remained and he had answered it in its original form.

Following the last above quoted statement of the court to the witness, after a colloquy between counsel and court, and some statements of the witness which are immaterial upon the consideration of the question now before us, the witness testified as follows:

"A. What people said, he was a quick-tempered man and would hurt you, hit you with anything.

"Q. Did he or not have the reputation of being a man who would strike you suddenly and without any apparent provocation?"

(After some colloquy between counsel and the court about the propriety of the latter question, the court said to the witness—"You can answer it that way." Whereupon the witness answered the last question as follows):

"A. Yes, sir."

*On cross-examination.*

"Q. You say he had the general reputation of being a man who would knock you in the head for nothing, that is about the substance of the question.   That was his general reputation all over that country?   .

"A. It was stated that way, at least it was my understanding, that is I understood him to be that kind of a man."

Following this witness there were three other witnesses for the accused who were asked and answered the precise question under consideration, in its original form; two of them answered it, in substance, and almost in the same language as the witness Grizzle testified on the same subject; the remaining witness testified on the subject with some qualification of an affirmative answer.

[6, 7] 5. Did the court err in refusing to allow two witnesses for the defense to answer the following question?   "Do you know the general reputation of Rufus Sutherland in the community in which he lived for being a man who ·visited and kept on his premises lewd women for immoral purposes? (there being an avowal by counsel that if permitted to answer the witnesses would have both stated that the general reputation of the deceased was "that he had kept and had kept for a number of years a number of lewd women which he visited for immoral purposes, and that (he) supported and provided for some of them, among others Maude Trivett and Maude Sexton").

The question must be answered in the negative.

Counsel for the accused correctly take the position that the existence of illicit relations between Ida Wagner and the deceased could be shown as evidence tending to show bias in her testimony in favor of the prose-

cution; and the following authorities are cited to sustain the position, namely: Underhill Crim. Ev., sec. 248, p. 454; *Leach* v. *Commonwealth*, 129 Ky. 497, 112 S. W. 595; *Perdue* v. *State*, 126 Ga. 112, 54 S. E. 820; *Brown* v. *State*, 119 Ga. 572, 46 S. E. 833; 2 Wigmore on Ev. secs. 948-9; *Hanriot* v. *Sherwood*, 82 Va. 1, at p. 16; 28 R. C. L. sec. 243, p. 658; 1 Greenleaf on Ev. (16th ed.) sec. 450, p. 575; 40 Cyc. p. 2656; *Commonwealth* v. *Gray*, 129 Mass. 474, 37 Am. Rep. 378; *State* v. *Neiburg*, 86 Vt. 392, 85 Atl. 769; *State* v. *Snyder*, 86 Vt. 449, 85 Atl. 984; *State* v. *Eggleston*, 45 Ore. 346, 77 Pac. 738; and *Sutton* v. *State*, 124 Ga. 815, 53 S. E. 381, 383. These authorities, however, only go to the extent of holding that the illicit relations of a witness to the deceased, in a case of homicide, just as any other relations of a witness to parties to a suit, likely to influence the testimony of the witness, may be shown by proper evidence; and that such evidence is always admissible, as tending to show the bias of the witness, whether elicited upon the examination or cross-examination of the witness, or, where the witness denies the existence of the relationship in question, it is the proper subject of independent testimony as tending to show bias on the part of the witness.

The court, in accordance with these authorities, admitted in evidence testimony introduced in behalf of the accused, in which one witness stated (as of her own knowledge) that illicit relations existed between the deceased and Mrs. Wagner, and the testimony of other witnesses that the general reputation of Mrs. Wagner for chastity was bad.

The court also, it may be here mentioned, allowed the accused to introduce testimony of witnesses who stated that the general reputation of Maude Owens for chastity was bad.

None of the authorities cited as aforesaid, however, nor does any other with which we are acquainted, hold that particular facts, such as those mentioned in the question under consideration, can be proved by general reputation on the subject.   On the contrary, it seems plain that the elementary rule that particular or specific facts cannot be proved by reputation evidence, rendered the evidence sought to be elicited by the question under consideration inadmissible.   1 Greenleaf on Ev. (15th ed.), sec. 138, p. 202; 2 Wigmore on Ev., secs. 1421 to 1626, inclusive, and especially secs. 1421, 1583, 1585, 1586, 1610, 1626.   As appears, indeed, from the citations from Wigmore on Evidence just made, the facts in question do not fall within any of the exceptions to the hear-say rule, so as to permit them to be established by reputation.   Hence they fall within the ban of that rule.

The accused did not offer to introduce evidence of the general reputation of the deceased for chastity, which they might have introduced under the rulings of the court.

[8] 6. Did the court err in striking out the italicised portion of the following instruction, asked for by the accused, and in giving the remainder of such instruction, namely:

"The court tells the jury that, in determining the weight to be given to the testimony of different witnesses in this case, the jury should consider the relationship of the witnesses to the defendants and to the deceased, if the same is proved; *the illicit relation of certain of the witnesses with the deceased, if the jury believe that any such illicit relations existed;* their interest, if any, in the result of this case, their temper, feeling, bias, or prejudice in favor of or against the defendants or the deceased, if any has been shown; their demeanor while

testifying; their apparent intelligence, and their means of information; and to give such credit to the testimony of such witnesses as under all the circumstances such witness seems to be entitled to."

The question must be answered in the negative.

It is earnestly argued that the accused had the right to have the minds of the jury directed to the specific evidence in the case (citing *Karnes' Case,* 125 Va. 758, at page 768, 99 S. E. 562, 4 A. L. R. 1509, and Burks' Notes on Crim. Proc., sec. 258); and that the action of the court in striking out the reference to the illicit relations of certain of the witnesses deprived the accused of the benefit of having the attention of the jury called to the consideration of such relations as tending to show the bias of the witnesses.    We do not agree with the view that the court's action had the result claimed. We think that the instruction as given was sufficiently specific to direct the attention of the jury to the consideration of the evidence upon the subject of the illicit relations of the witnesses affected, along with any other circumstances of temper, feeling or prejudice, as tending to show their bias.    The witnesses affected were only Ida Wagner and Maude Owens.    The Sexton and Trivett women did not testify in the case.    To have singled out the relations which were illicit in such an instruction, as the eliminated portion of the instruction would have done, would have given undue emphasis to the effect of that kind of relationship and have tended to mislead the jury into considering that such relationship had a peculiar and unusual effect in biasing a witness.

[9-13] 7. Did the court err in the following named action with respect to the giving and refusing of instructions?

The court gave the following instructions at the request of the Commonwealth:

"No. 11. The court instructs the jury that in considering whether or not Ross Bumgardner is a principal in the second degree in this case, present, aiding, abetting, counseling, advising or consenting to said killing of Rufus Sutherland, they may consider all the facts and declarations of the said Ross Bumgardner at the time of said killing, both before and after said killing, and if they believe from the whole evidence that he was aiding, consenting, and abetting in said crime, then he is guilty in this case.

"No. 12. The court instructs the jury that if they believe from the evidence in this case beyond a reasonable doubt that Toy Rasnake wilfully, maliciously, deliberately and premeditatedly shot and killed Rufus Sutherland in the county of Russell and that the dedendant, Ross Bumgardner, was present aiding, abetting, counseling, advising or consenting to said crime, that then both Toy Rasnake and Ross Bumgardner are equally guilty of murder in the first degree in this case."

At the request of the accused the court gave the following instruction on the same subject:

"No. 8. The court further instructs the jury that there can be no such thing as an aider and abettor unless there is a principal in the commission of a crime; and, it is, therefore, necessary for the Commonwealth to prove beyond all reasonable doubt that the principal is guilty of the offense charged before the jury can consider the question as to whether there is an aider or abettor. And the jury is instructed that mere presence is not sufficient to constitute one an aider and abettor, and that whenever reasonable doubt exists as to the intentions of one charged as an aider and abettor, he cannot be found guilty as an aider and abettor; and the jury is further instructed that mere consent is not sufficient to constitute one an aider and abettor,

but before a defendant charged as an aider and abettor in the commission of a criminal offense can be convicted, it is incumbent upon the Commonwealth to prove beyond all reasonable doubt that the defendant so charged as an aider and abettor was present and shared in the criminal intent of the principal."

The accused requested the court to give the following further instruction:

"No. 9. The court further instructs the jury that mere presence and consent alone are not sufficient to constitute an aider or abettor in the commission of a crime in the meaning of the law."

The court refused to give the last named instruction, and, in lieu thereof, gave, on its own motion, the following further instructions:

"(A). The court instructs the jury that to constitute an aider and abettor it is essential that the aider and abettor should share the criminal intent of the principal or party who committed the offense.

"(B). The court instructs the jury that principals in the first degree in every murder or other crime are those who are the actors or actual perpetrators of the crime—those who are the immediate perpetrators of the act. That principals in the second degree are those who did not with their own hands commit the act, but were present aiding and abetting it. It is not necessary in order to make a person a principal in the second degree that he actually participate in the commission of the crime. The test as to whether or not he is principal in the second degree is, was he encouraging, inciting, or in some manner offering aid or consent to the crime? A person present lending countenance, or otherwise aiding, while another does the act, is principal in the second degree, and liable to the same punishment as if he were principal in the first degree and actually committed the crime."

The question must be answered in the negative.

When the instructions in question, which were given, are all read together, and in the light of the evidence in this case, we think they fully and accurately. instructed the jury upon the subject of what conduct on the part of Bumgardner constituted him an aider and abettor in the commission of the crime 'of the murder charged.

Instruction 9 offered by the accused was properly refused for the reason that it was not in accord with the evidence, in its assumption that the jury could consider it a case in which there was no evidence beyond that of the mere presence and consent mentioned.   Indeed, instruction  No. 2 given was open to the same objection, and was too favorable to the accused in that its language was not sufficiently guarded in the particular just mentioned.   This is not a case in which there was no evidence beyond that of the mere presence and consent of Bumgardner.   There was evidence of the most damning character, since it came from admissions in the testimony of both of the accused, tending to show that the accused, Rasnake and Bumgardner, on the morning of the homicide, united to accomplish the common purpose of killing the deceased, and that thereafter, until the deed was done, Bumgardner was present with Rasnake, lending him countenance and encouragement by the overt acts of having armed himself, by being present ready to help should necessity require it and by other conduct evidencing a criminal intent in entire accord with such intent on the part of Rasnake.   The evidence shows beyond question that the accused both armed themselves with the intention, while they were at South Clinchfield, to seek the deceased that day, with the design of killing him, as the jury were warranted by the evidence in believing. They

did together seek him, found him, and Rasnake, with Bumgardner standing by, ready to assist if needed, and with his will concurring in the deed, without any overt act of the deceased at the time giving any provocation, and when the deceased stood unarmed and defenceless, shot him and shot to kill—according to the direct evidence for the Commonwealth and inferences therefrom which the jury were warranted in drawing. The claim of the accused that when at South Clinchfield they formed the design aforesaid and prepared for the carrying of it out, their purpose was to see the deceased about a sheep, is absolutely refuted by the fact, developed in evidence, that at that time, so far as the sheep was concerned, they had no thought of seeing the deceased on that subject; that Rasnake's plan about hunting and killing the wild sheep would have taken him in a different direction from that of the home of the deceased; and that even according to the testimony of and for the accused on that subject, the suggestion that they see the deceased about the sheep did not come to them until after they had formed the design aforesaid of seeking the deceased and had armed themselves and had set out from Mrs. Sutherland's upon the execution of that design. This being so, why the falsehoods in the testimony of both of the accused on the subject of the purpose for which they got the pistols, and the laboriously attempted building up of the sheep-hunt defense, which, when the facts developed in evidence, toppled like a house of cards? Why the admittedly false statement to Edmunds of the reason for borrowing the pistol of him? When to the utter breakdown of the sheep-hunt defense is added the other circumstances in evidence, it is plain that there was ample evidence to warrant the jury in finding that Rasnake was guilty of the wilful, deliberate and

premeditated murder of the deceased and that Bumgardner aided and abetted him in the commission of that crime.

Instructions A and B, given by the court of its own motion, are in the exact language of instructions approved by this court in *Horton's Case*, 99 Va. 848, 38 S. E. 184.

[14] It is true that it is well settled that the mere presence and consent alone are not sufficient to constitute one an aider and abettor in the commission of a crime. 1 Bish. New Cr. Law (8th ed.), sec. 633; *Kemp's Case*, 80 Va. 443, at p. 450; *Wooden's Case*, 117 Va. 930, 86 S. E. 305, Ann. Cas. 1917D, 1032; 1 Wharton's Cr. Law (11th ed.), sec. 249, p. 321. But that is so because in such case there is no direct or circumstantial evidence (such as an unequivocal overt act or acts) which the law can take hold of to show that the will of the person in question contributed to the commission of the crime. Where, however, the evidence shows that two (or more) persons are together in execution of a common plan or purpose which is unlawful, the situation is wholly different. In such case there is the evidence of the common plan, which shows the criminal intent of them all; and the overt act, say of one, in being present ready to assist if needed while another of them commits the crime, which, with the proof of the common plan, evidences that both the will and deed of the former contributes to the commission of the crime; although such person takes no active part at the time of the final deed by which the crime is consummated. Such evidence the law can and will take hold of and it is abundantly sufficient to establish the guilt of the offense under consideration.

As said in 1 Bish. New Cr. Law (8th ed.), sec. 632: "1. *Will Contributing*—This reasoning conducts us to

the conclusion that every person whose corrupt intent contributes to a criminal act, in a degree sufficient for the law's notice, is guilty of the whole crime. Thus—

"2. *Present—Countenancing* * * —All who are present at a riot, * * * or any other crime, if lending it countenance and encouragement, and especially if ready to help should the necessity require, are liable as principal actors."

In *Kemp's Case*, especially relied on for the accused, at page 452 of 80 Va., this is said: "In all the evidence in this case (and there is no conflict of evidence in any respect) there is not a circumstance disclosed tending in the least to show any agreement of formed design between the prisoner, Kemp, and the man, Whitehurst, who did the killing; * * nor that he in any manner aided or abetted in, or assented to, the felonious act of Whitehurst, the sole perpetrator thereof; nor was there a moment of time in which there could have been an agreement between the real perpetrator and the prisoner. Nor is there an intimation of any agreement or design on the part of the prisoner to commit any other unlawful purpose. The testimony established nothing except the mere presence." A wholly different case from that now before us.

The same is true of the facts in *Wooden's Case, supra,* also relied on for the accused, and to the facts to which the other authorities just cited, likewise relied on for the accused, are applicable, in so far as the subject under consideration is concerned.

8. Did the court err in refusing to set aside the verdict, as against evidence and without evidence to support it?

This question, too, must be answered in the negative.

The chief points urged in argument for the accused upon this question are the following:

[15] (a). That the Commonwealth failed to show any motive for the crime on the part of the accused.

We cannot agree with this view of the evidence. Since the occurrences were all in a small rural community the jury were warranted in believing that the accused both knew the fact shown by one of the witnesses for the accused, to the effect that the deceased had a fixed and determined purpose to put an end to the illicit intercourse of the accused with the Sexton and Trivett women while they were on the deceased's premises. Indeed, Bumgardner's brother was present on the occasion mentioned by this witness, so that there can be but little, if any, doubt that Bumgardner and Rasnake, his first cousin, living near by, were informed by this brother of the attitude of the deceased, if they did not already know of it. And whether the jury believed that this attitude of the deceased was due to jealousy on his part, or to some other, and possibly a more laudable reason, is immaterial. The fact that the accused knew that the deceased stood in the way of their continued intercourse with these women, was a sufficient motive for the crime.

[16] (b). That the Commonwealth's case rests chiefly upon the testimony of Ida Wagner, and, in a lesser degree, upon the testimony of Maude Owens; both of whom, it is claimed, are shown by the evidence to be women of lewd and unchaste character. If it were conceded that the jury considered that the character of these women for chastity was bad; still, we cannot say that the jury were not warranted in believing that they told the truth touching the material facts to which they testified concerning the conduct of the accused. Their credibility was a matter solely within the province of the jury.

(c). That Ida Wagner, soon after the homicide, told

a witness for the accused that Bumgardner shot the deceased.

[17] Ida Wagner denied this. Whether that was a fact, and if so, how far it affected the reliance to be placed on her testimony as to what in truth occurred at the time of the homicide, was for the jury to determine.

[18] (d). That the testimony for the accused tended strongly to show that improper relations existed between the deceased and Ida Wagner; that she was a biased witness; that the time and place of the killing rendered it incredible that it could have occurred as Ida Wagner said it did; and that the repeated performance of the raising and lowering of the pistol by Rasnake, detailed by her, is incredible.

There is nothing physically impossible in any of this. It all may have occurred just as Mrs. Wagner stated that it did. She is corroborated by the physical facts of the position of the body and the pick when first found by other witnesses who testified in the case; by the location of the fatal wound; and by the testimony of Ellie Coffee, so far as she saw what occurred. It is true that the testimony of both of the accused as to what occurred at the shooting was also in accord with these physical facts, if their statements to the effect that the deceased, after he was shot, walked backward to the place at which he fell, were true. What was the truth depends upon the credibility of these witnesses. Upon that the verdict of the jury is conclusive upon us.

9. There are a number of other assignments of error, all of them, as well as those disposed of in what we have said above, ably presented and argued by counsel for the accused, but as they present no novel, nor, indeed, any even debatable questions, when they are closely considered, we deem it sufficient to say that we have examined them all carefully and find no merit in any of them.

The case will be affirmed. *Affirmed.*