# 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉

## C. A. FRAZIER v. COMMONWEALTH.

January 15, 1931.

Present, Campbell, Holt, Epes, Hudgins and Browning, JJ.

*Carter & Talbott* and *Hugh T. Williams*, for the plaintiff in error.

*John R. Saunders, Attorney-General*, and *Edwin H. Gibson* and *Collins Denny, Jr., Assistant Attorneys-General*, for the Commonwealth.

BROWNING, J., delivered the opinion of the court.

In the Circuit Court of the county of Pittsylvania, Va., on November 20, 1929, the accused was found guilty of violating the prohibition laws of the State.

The indictment contained six counts which included about all of the violations of which one could be guilty.

The verdict of the jury was in the following words and figures: "We, the jury, find the defendant guilty of *aid* and abetting in unlawful possession of ardent spirits as charged in within indictment and fix his punishment at one month in jail and fine of $100.00."

The case is before this court upon a writ of error and supersedeas, and the sole assignment of error was the refusal of the court below to set aside the verdict as being contrary to the law and evidence and without evidence to support it, and in entering judgment in accordance therewith.

The evidence is that the accused owned and operated a filling station and general store near the city of Danville,

Va., and just on the border line of the States of Virginia and North Carolina, the filling station and store being in the State of North Carolina and a telephone booth or house, controlled by the accused, located on the Virginia side of the passing highway.

On August 5, 1929, just after dark, four officers of the law of North Carolina ensconced themselves in a body of woods just back of the property of the accused for the purpose of watching and raiding the premises. It does not appear why they chose this particular time. They arranged themselves behind trees so that the premises could be seen from different angles and they were all about the same distance away—from fifteen to twenty steps—except one, W. D. Love, a deputy sheriff, who said he was twenty feet from the filling station. The officers could see the buildings and the space between them by the electric lights in the front of the filling station but they were unable, of course, to see directly in front of either of the structures because they were hidden in the rear. Shortly after they had reached their hiding places a large car came up to the 'phone booth from the North Carolina side, and one of the officers, Deputy Sheriff Oakley, said that the accused met the car "and it looked like he taken something out of it but he was not positive." On cross-examination he was asked the question: "You did not see anything he took yourself?" And his answer was: "No, sir."

Officer Love, another deputy sheriff, said that he saw someone go out to the big car and take something out which was in a sack and that the package looked like a five gallon can and that it seemed to be heavy, but he did not know who the man was. He could not identify the man as the accused.

Officer Wilson said he saw some man take something out of the big car but he did not know who he was, that he did not see anybody go to the car.

Officer Allison said that when the big car drove up somebody went out and got a can of something in a sack and carried it toward the 'phone house but he could not tell who the man was.

As the big car moved off towards the north a Ford roadster came up from the North Carolina side and stopped at about the filling station, the opening and shutting of the door was heard and a boy was seen to go from in front of the filling station to the telephone booth and from there went on the Virginia side in the rear with a large bundle in his arms, and he went into a tobacco field a short distance away and deposited the package. This boy returned to the booth and carried from it an empty tin can which he threw into a pile of rubbish in the space which was used for oiling cars. This tin can was afterwards found and it smelled of whiskey.

The accused was seen to go from the 'phone booth to the filling station and then again from the filling station to the 'phone booth with something in his hand which looked like a stick or a hammer, and while the accused was at the 'phone booth a noise was heard which sounded like driving a bung into a keg. The North Carolina officers searched the filling station and store of the accused and found a few bottles in the filling station but no ardent spirits or anything that contained the odor of ardent spirits.

The 'phone house and the field where the sack had been deposited being in Virginia, officers from Virginia were telephoned for. They arrived promptly and went to the tobacco field and secured the sack which contained a keg with four gallons of whiskey in it. They then searched the 'phone house, which the accused unlocked for them, and found a keg similar to the one containing the liquor and a sack similar to the one found in the field, being ordinary tow or fertilizer sacks, and a few bottles and fruit jars. The field where the whiskey was found was owned

by a man named Siddle and the accused had no sort of connection with it or control over it.

It may here be said that when the North Carolina officer informed the accused that they had a warrant to search his premises he replied that they did not need a warrant, that they were perfectly free to make the search. All of the Commonwealth's witnesses, seven in number, testified that the reputation of the accused for violating the prohibition laws was bad.

The accused testified that he did not see any car that night that had any whiskey in it; that he did not get any whiskey out of any car; that the keg in the telephone house was one that he had had cider in; that he sold fruit jars as a merchant; and that children picked up bottles and traded them to him for candy and he would sell them to junk dealers; that he did not see anyone handle a keg and that he did not see any person take a package from a car; that it was his habit to be in front of the filling station as much as possible for the purpose of attracting and waiting upon customers and that he was frequently up and down the driveway with an oil stick in his hand for the purpose of examining cars to ascertain if they needed oil.

A boy was seen to carry the package from about the telephone booth to the tobacco field and place it there and then return to the place of the said booth and take a tin can that smelled of whiskey and throw it in the space used for greasing cars. When this happened the accused was at the filling station.

This boy was never identified nor was his Ford car, and as far as the evidence shows, no effort was made to do so. He was not interviewed by the officers who saw him and he abandoned his car and got away without being apprehended. His car was not there the next morning; so the presumption is that he returned during the night and secured it.

We have stated the case as favorably to the Commonwealth and as unfavorably to the accused as the evidence appears to warrant. The theory of the Commonwealth is that the accused knew the purpose of the coming of the big car; that he met it by design and took from it a package containing the liquor which was in the tin can; that there was a prearranged plan with the boy to play the part which he did in the drama; that they together transferred the liquor from the can to a keg and drove the bung in the keg and thus the accused was a *particeps criminis* in the commission of the crime charged; that he aided and abetted the boy in the possession of the liquor which was found in Siddle's field.

In the case of *Gray* v. *Com.*, 150 Va. 571, 142 S. E. 397, it was said "a man's mere presence when a crime is committed will not make him an aider and abetter in the commission of the crime. To make him an aider or abetter, he must be *shown* to have procured, encouraged, countenanced, or approved the commission of the crime." (Italics supplied.)

The case of *Triplett* v. *Com.*, 141 Va. 577, 578, 127 S. E. 486, is very enlightening as to evidence that is sufficient to sustain a conviction in the character of crime we are considering, and the case, in principle, is not unlike the one in judgment.

In that case a sale of liquor was made by the defendant's wife in the store room, which was occupied and operated by the defendant and his wife, and when the defendant was present and, according to one witness, "only a few feet away and could have seen and heard." There was testimony that the defendant's eyesight was impaired and it was not shown that he had knowledge of the illegal transaction. There was testimony that empty bottles were found under the counter and two five-gallon tin cans were in the

store, one of which had the odor of whiskey. The defendant accounted for the presence of these.

The court said: "Giving to this evidence the fullest possible weight, it fails to demonstrate, with that clarity essential in a criminal case, that the defendant did hear or see what was taking place between the witness and his wife. To say that there was a possibility, or, at most, a probability, that the defendant saw and heard what was done and said will not suffice; the act alleged in the indictment must be proved as charged.

"If it be conceded that the defendant remained silent when caution and reason dictated that he should speak, this, while a circumstance consistent with his guilt, is also a circumstance not inconsistent with his innocence. This being true, it was the duty of the jury to give him the benefit of the doubt and render a verdict of not guilty. * * *

■ "It seems, also, equally clear to us that the Commonwealth has failed to show that he was an aider and abettor. To constitute one an aider and abettor, he must be guilty of some overt act, or he must share the criminal intent of the principal or party who commits the crime."

In *Rasnake's Case*, 135 Va. 710, 115 S. E. 543, Sims, P., cites with approval *Kemp's Case*, 80 Va. 443, and *Wooden's Case*, 117 Va. 930, 86 S. E. 305, Ann. Cas. 1917D, 1032, wherein it is held that the settled rule is that mere presence and consent alone are not sufficient to constitute one an aider and abettor in the commission of a crime.

■ The evidence in the case in judgment lacks that positiveness and cogency which compels conviction. The most that can fairly be said for it is that it casts suspicion upon the accused.

In important particulars, as shown in the above statement of facts, the officers (witnesses), with apparently equal opportunities of observation, differed materially.

"It fails to demonstrate, with that clarity essential in a criminal case," the guilt of the accused beyond a reasonable doubt.

For the reasons given, the judgment of the trial court is reversed and annulled; the verdict of the jury set aside, and the case remanded for a new trial, if the Commonwealth be so advised.

*Reversed and remanded.*

CAMPBELL and HOLT, JJ., dissenting.