COURT OF APPEALS OF VIRGINIA

Present:   Judges Huff, Athey and Fulton
Argued by videoconference


ANAYAH DAILY, S/K/A
  ANAYAH NAREE DAILY

                                                      MEMORANDUM OPINION* BY
v.        Record No. 0490-21-2                      JUDGE JUNIUS P. FULTON, III
                                                          APRIL 26, 2022

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF CHESTERFIELD COUNTY
David E. Johnson, Judge

Todd M. Ritter (Daniels, Tuck & Ritter, on brief), for appellant.

Leah A. Darron, Senior Assistant Attorney General (Jason S.
Miyares, Attorney General, on brief), for appellee.


        Appellant and two codefendants, Darrell Wilson and Antwoine Durham, were indicted for

the willful, deliberate, and premeditated murder of Breland Poole on April 29, 2018, at the Ivy Walk

apartment complex.[1]  Following a three-day trial, a jury convicted appellant of first-degree murder,

in violation of Code § 18.2-32.  On appeal, appellant argues that the evidence failed to prove that

she acted as an accomplice to first-degree murder, either as an accessory before the fact or principal

in the second degree.  Appellant further contends that the trial court erred by admitting certain

out-of-court statements at trial because they were irrelevant and unfairly prejudicial.  For the reasons

that follow, we affirm the trial court's judgment.

_____

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] The circuit court convicted Antwoine Durham of Breland Poole's first-degree murder in
a separate trial.  At appellant's trial, the circuit court ruled that evidence inadmissible.  Wilson's
case was pending trial at the time of appellant's prosecution.

## I. BACKGROUND

In accordance with familiar principles of appellate review, we state the facts "in the light most favorable to the Commonwealth, the prevailing party at trial." *Gerald v. Commonwealth*, 295 Va. 469, 472 (2018) (quoting *Scott v. Commonwealth*, 292 Va. 380, 381 (2016)). In doing so, we discard any of appellant's conflicting evidence, and regard as true all credible evidence favorable to the Commonwealth and all inferences that may reasonably be drawn from that evidence. *Id.* at 473.

Wilson testified at appellant's murder trial under a cooperation agreement with the Commonwealth.[2] Wilson described how two months before Poole's murder, on February 27, 2018, he and Durham drove to a sporting goods store to purchase two Glock pistols. Because Wilson was ineligible to buy a firearm, he had his girlfriend, Ashley Tucker, and her friend, Imari Carter, illegally purchase the guns and relinquish them to Durham afterward. Store records confirmed the purchase of a "9mm [Luger] Glock G26 pistol" and ".357 [magnum] Glock G32 pistol."

Two days before Poole's murder, Wilson was at his residence with Durham when Durham received a phone call from appellant that made him visibly "frantic" with anger. In response, the two men immediately drove "ten minutes up [Chippenham Parkway]" to appellant's apartment, where Durham spoke to appellant privately in her bedroom. "[M]ad to the point that he was crying," Durham exited the bedroom a few minutes later, exclaiming, "I'm going to kill that nigger." At the time, Wilson did not interpret the exclamation as a serious threat because Durham is "the type of person" that he will "just say anything" when mad. The men returned to Wilson's home and spent the following day together.

---

[2] The Commonwealth introduced a copy of Wilson's signed "Memorandum of Understanding" as an exhibit at trial. Wilson admitted that he hoped the Commonwealth would not compel his girlfriend's testimony and would offer some measure of consideration in exchange for his testimony at appellant's trial, although the Commonwealth had made no promises.

Myasia Goodnight, Poole's girlfriend, testified that she was with him the weekend of his murder. Beginning on Friday, April 27, Poole became "standoffish" and Goodnight "could tell that something was up." The day of his murder on April 29, Poole remained at her home until approximately 9:00 p.m., when he departed after receiving "a message or something [on] his phone." Goodnight saw that he "kept flipping his phone over" for approximately "10 to 20 minutes" before leaving in his gold Taurus.

That same day, Wilson and Durham smoked marijuana at Wilson's apartment until "it got dark outside," when they drove to appellant's apartment. As he waited in the car in the parking lot, Wilson saw Durham stand outside of appellant's open bedroom window and converse with someone inside for "[no] more than five minutes." Wilson could not discern whether Durham was speaking to appellant. The two men then drove "out of the complex" to park on the shoulder of Chippenham Parkway. Durham exited the car, and Wilson watched him walk "through the woods" along a commonly trafficked path toward the Ivy Walk apartments. "Less than 30 minutes" later, Durham came "running [back] out of the woods," and Wilson drove them to his residence. A few days later, Durham "[left] his [Glock Model 32 pistol] somewhere out of state" and sold the Glock Model 26 in New York at Wilson's request, sharing the sale proceeds with him.

At 10:24 p.m. on the night of Poole's murder, Chesterfield County Police Officers Bowen and Painter arrived at the parking lot of the Ivy Walk apartment complex in response to two 911 calls. On the first call, dispatchers heard Poole's muffled moans. On the second call, a resident of the complex reported hearing "four to five" gunshots "outside of her [apartment] window" and seeing a "heavy-set male" in black clothing "running past her building toward the woods."

Upon arriving at the apartment complex, Bowen discovered a gold Ford Taurus parked directly in front of the second caller's apartment, near a wooded area. A "10- to 12-inch hole"

punctured the driver's side window, and an unconscious Poole sat "slumped over" in the driver's seat, holding a cell phone and bleeding from multiple gunshot wounds to his chest and arms. Poole ultimately died of his injuries.

"Within 10 minutes of . . . finding the victim," Painter "deployed" a trained police dog to pursue any potential fleeing suspects. Following signs of recent "ground disturbance combined with human odor," the dog tracked from Poole's car up a hill and through the woods before losing scent at Chippenham Parkway. Painter noticed "leaves that [had] been rustled and lifted up," indicating that "somebody had just r[u]n up [the] hill." Officer Rhodenizer followed the same track using another trained police dog and concluded from evidence of fresh "ground disturbance" that the suspect fled within the past "hour to [an] hour and a half." Police subsequently discovered that Poole may have been at the Ivy Walk apartments to visit appellant, a sixteen-year-old high school student.

The day after the shooting, on April 30, 2018, Detectives Waggoner and Lewis interviewed appellant at her school. Before speaking to them, appellant asked "to leave the room [to] see the [school] nurse." She returned "several minutes" later and began answering questions with her mother on the phone to hear the conversation. Appellant said that she lived at the Ivy Walk apartments with her mother and claimed that she "only knew [Poole] through Instagram," a social media platform where he used the alias, "B dot LO." She gave Poole her cell phone number at his request, and the two began "texting and calling back and forth" during the "past couple days."

Appellant told police that two days before Poole's murder, on April 27, she and Poole met at appellant's apartment complex to smoke marijuana in his car, but she returned home after he tried to initiate sexual intercourse. On April 29, appellant conspired with Poole to "sneak" out of her bedroom window "to hang out" with him while "her mother was out of the house," but her

- 4 -

mother returned home before she could do so. Appellant described that shortly afterward, she "heard gunshots . . . outside her window" and "hoped it wasn't [Poole]" because she "knew he was in the complex" waiting for her. Appellant admitted that she did not contact Poole to check on his welfare after hearing the gunshots, claiming that she feared doing so "would backfire" because "it might look like she had something to do with [the shooting]."

Pressed for additional information, appellant maintained, "I don't know [Poole]. What [sic] would I have a reason to either do it myself or to get someone to do it to him?" She admitted, however, that she had deleted her cell phone texts and Instagram messages with the victim "as soon as she . . . saw" the detectives waiting for her because "she was scared."[3] Waggoner searched appellant's phone to review its contents, but a white "start-up screen" appeared when he "pressed the power button." He recognized the display as consistent with "an iPhone that has no data on it . . . [as though it were] completely new out of the box." When confronted, appellant admitted that she performed a "factory reset" of her iPhone to remove its data when she had excused herself to visit the school nurse, explaining that "she was scared."

A month-and-a-half later, on June 14, 2018, appellant testified before a multi-jurisdictional grand jury regarding the shooting.[4] Appellant testified that she did not consider Poole a friend because she had only "met him a few times" before his death, but she regarded the two men who were later indicted as her codefendants, "Antoine Durham and Darrell Wilson," to be "like brothers." She sometimes "sneaked" Durham and Wilson into her apartment, and Wilson "occasionally" lived there. Appellant testified that Poole had raped her in

---

[3] Business records from appellant's Instagram account introduced at trial established that several messages dated April 27, 28, 29, and 30, 2018, had been deleted.

[4] At the time of her grand jury testimony, police had not yet arrested any suspects in Poole's murder.

his car "the Friday before he was shot." She denied ever telling anyone about the alleged rape until after Poole's death, maintaining that she "was [too] scared to tell anyone" until "later."[5]

Forensic Scientist Stephanie Walcott, an expert in firearm and toolmark examination, inspected the cartridge casings and bullets recovered from the shooting. Walcott determined that all four cartridge cases were marked as "Winchester 9mm Luger" caliber and each of the bullets had been fired from the same, "Glock type" firearm. "[W]ithout the actual firearm to compare them to," however, Walcott could not "definitively say" that both the cartridge casings and the bullets were fired from the same gun. Moreover, she testified that a bullet recovered from Poole's lung bore characteristics consistent with "hollow point" ammunition, although it was "indeterminate" whether the other bullets were also hollow points.

Detective Wagonner obtained search warrants for the cell phones and social media accounts of appellant, Durham, Wilson, and Poole.[6] Based on his review of Poole's cell phone records spanning a six-month period, Wagonner testified that Poole first called appellant on April 25, 2018. At 5:53 p.m. on April 27, 2018, Poole answered a call from appellant, and Durham later called Poole at 7:26 p.m. the same day, but the call went unanswered. The only time Durham ever called Poole during that six-month period was on April 27, 2018, two days before Poole's murder, the same day that appellant alleged that she had been raped.

Testifying as an expert in "cell site analysis[,] cellular technology[,] and location data analysis," Federal Bureau of Investigation Special Agent Jeremy D'Errico used historical location data associated with Wilson's cell phone to determine his location on the day of Poole's

---

[5] Investigator Jordan subsequently searched Poole's vehicle for the presence of biological fluids associated with sexual intercourse that might corroborate appellant's rape allegation and found none.

[6] The Commonwealth introduced business records pertaining to phone calls, location data, and social media accounts establishing each of the specific Instagram accounts and cell phone numbers belonging to appellant, Wilson, Durham, and Poole.

murder. Generating a map depicting the position of Wilson's phone relative to his residence and appellant's apartment, D'Errico testified that on April 29, 2018, from 8:45 p.m. until 10:00 p.m., Wilson's phone was located near Wilson's residence, and between 10:00 p.m. and 10:09 p.m., it traveled along Chippenham Parkway toward appellant's apartment. D'Errico concluded that it was possible Wilson's phone was near the shoulder of Chippenham Parkway from 10:08 p.m. until 10:24 p.m., and, from 10:24 p.m. until 10:45 p.m., Wilson's phone moved from the vicinity of Ivy Walk apartments toward Wilson's apartment. D'Errico determined that Wilson's cell phone was either sending or receiving texts or calls at his residence at 10:33, 10:34, and 10:37 p.m.

During the trial, the Commonwealth introduced business records pertaining to Instagram messages that were sent to or exchanged with appellant's cell phone. Appellant initially objected to all of the records based on "foundation," "hearsay," "relevance," and confrontation grounds. Later, defense counsel specifically objected to Instagram messages that would become Commonwealth's Exhibit 56, consisting of a March 23, 2018 exchange wherein Durham expressed his desire and intent to kill someone that appellant claimed to have raped her. Referencing someone other than Poole, appellant told Durham in that exchange, "This niggas whack . . . I should say he raped me[.]" Durham responded, "Please lemme kill him, lol let me shoot him . . . Let's shoot him," "Imma kill him."

Appellant argued that the message exchange was "irrelevant" because it "happened over 30 days before [she] even met [the victim]" and was "posted on someone else's Instagram page" over which she had no control. Additionally, appellant contended that it was "highly prejudicial" because it contained "lots of text messages" from unknown sources that "[Durham] is not here to testify" about. The trial court overruled the objections, finding "there are actions . . . prior to the

crime that are relevant." Subsequently, the Commonwealth voluntarily redacted the exhibit to limit its scope strictly to exchanges between appellant and Durham.

The Commonwealth introduced additional content at trial from appellant's Instagram account. In mid-March before the shooting, appellant provided Wilson's cell phone number in response to a message inquiring, "What's glocko #?" Approximately one month before Poole's murder, appellant shared a photograph captioned "[s]moke for sale," which depicted her aiming a pistol at the camera with her tongue extended. Four days before the shooting, appellant provided her cell phone number to Poole at his request. Later, in an exchange with a third party on the morning of Poole's murder, appellant responded, "Me getting raped," when asked, "What is the one thing you wish never happened?"[7] The day after the murder, appellant wrote, "WHY in all of tf would you let them dumbass burnt oak ass bitches hold yo gun . . . with the clip in that bitch." About two weeks later, appellant wrote to Durham, "I'm in some shit to sum it up everybody try saying I set somebody up. . . . To be killed." Finally, in late May following the incident, appellant wrote that "[her mother] swear[s] [t]he police is [after us]," in response to Durham's message, "Nobody is after us" because otherwise "[police] woulda been kalled [her mother] & told her bring you in and they woulda been went to my mom house."

At the conclusion of the Commonwealth's evidence, appellant moved to strike, arguing that the Commonwealth failed to prove that she had the specific intent to kill Poole and that there "has been no evidence . . . that [she] planned, plotted, participated, or encouraged" Poole's murder. The trial court denied the motion, and the jury subsequently found appellant guilty of first-degree murder. This appeal follows.

---

[7] Instagram records reflected that this exchange was posted to appellant's account at "13:39:13 UTC" on April 29, 2018, just hours before Poole was murdered the same day. During the grand jury hearing in June, appellant testified that she never told anyone about the rape until after Poole was dead.

## II. ANALYSIS

Appellant argues that the evidence was insufficient to prove that she "acted, with the requisite mental state, as a principal in the second degree or accessory before the fact" to Poole's first-degree murder. Appellant further contends that the trial court erred in admitting Commonwealth's Exhibit 56 at trial because the statements it contained were irrelevant and unfairly prejudicial. We consider each argument in turn.

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Id.* (alteration in original) (quoting *Secret v. Commonwealth*, 296 Va. 204, 228 (2018)). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *McGowan*, 72 Va. App. at 521 (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

### A. The evidence was sufficient to prove that appellant was an accessory before the fact to Poole's first-degree murder.

Appellant argues that the evidence was insufficient to prove that she acted either as a principal in the second degree or accessory before the fact to Poole's first-degree murder. Relying on our Supreme Court's decision in *Jones v. Commonwealth*, 208 Va. 370 (1967), appellant contends that the evidence failed to prove that Durham murdered Poole or that appellant

"committed any overt act knowingly in furtherance of the crime, shared Durham's criminal intent, or . . . acted in concert with [him]." We disagree.

"In the case of every felony, every principal in the second degree and every accessory before the fact may be indicted, tried, convicted and punished in all respects as if a principal in the first degree." Code § 18.2-18. "A principal in the first degree is the actual perpetrator of the crime." *Thomas v. Commonwealth*, 279 Va. 131, 156 (2010) (quoting *Muhammad v. Commonwealth*, 269 Va. 451, 482 (2005)). A "principal in the second degree, . . . is one who is present, actually or constructively, assisting the perpetrator in the commission of the crime." *Id.* An accessory before the fact is "one not present at the commission of the offense, but who is [before] in some way concerned therein, . . . as (a) contriver, instigator or advisor, . . . of the perpetrator." *Tolley v. Commonwealth*, 216 Va. 341, 348 (1975) (quoting *Foster v. Commonwealth*, 179 Va. 96, 99 (1942); *Hitt v. Commonwealth*, 131 Va. 752, 759 (1921)).

In the trial of an accessory before the fact, the Commonwealth must prove the following elements beyond a reasonable doubt: "the commission of the crime by the principal, the accessory's absence at the commission of the offense, and that before the commission of the crime, the accessory was 'in some way concerned therein . . . as (a) contriver, instigator or advisor." *McGhee v. Commonwealth*, 221 Va. 422, 425-26 (1980) (quoting *Tolley*, 216 Va. at 348). Moreover, the evidence must "establish that the accessory before the fact shared the criminal intent of the principal." *Id.* at 427 (citing *Rasnake v. Commonwealth*, 135 Va. 677, 707 (1923). Specifically, "the accused must either know or have reason to know of the principal's criminal intention" and "must intend to encourage, incite, or aid the principal's commission of the crime." *Id.* (citing Rollin M. Perkins, *Parties to Crime*, 89 U. PA. L. REV. 581, 600 (1941)). "The amount of incitement or encouragement to commit the crime is irrelevant if the encouragement in fact induces the principal to commit the offense." *Id.* (citing Perkins, *supra*, at

- 10 -

598). Each of the foregoing elements present "questions of fact to be resolved by the fact finder." *Id.* (citing *Heller v. Commonwealth*, 137 Va. 782, 787 (1923); *Brown v. Commonwealth*, 130 Va. 733, 737 (1921)).

      1. The evidence proved that Durham perpetrated Poole's first-degree murder.

      Appellant first contends that the Commonwealth failed to prove the threshold element of "the commission of the crime by the principal" necessary to establish appellant's guilt as an accomplice. *Id.* at 425-26. She argues that because "Durham could not be conclusively linked to the shooting through physical evidence," his identity as the perpetrator of Poole's first-degree murder remained "speculative." We disagree.

      "At trial, the Commonwealth bears the burden of proving the identity of the accused as the perpetrator beyond a reasonable doubt." *Cuffee v. Commonwealth*, 61 Va. App. 353, 364 (2013) (quoting *Blevins v. Commonwealth*, 40 Va. App. 412, 423 (2003)). As with any element of an offense, identity may be proved by direct or circumstantial evidence. *Crawley v. Commonwealth*, 29 Va. App. 372, 375 (1999). "Circumstantial evidence is as competent and is entitled to as much weight as direct evidence, provided it is sufficiently convincing to exclude every reasonable hypothesis except that of guilt." *Holloway v. Commonwealth*, 57 Va. App. 658, 665 (2011) (quoting *Coleman v. Commonwealth*, 226 Va. 31, 53 (1983)). "Circumstantial evidence is not viewed in isolation." *Id.* (quoting *Commonwealth v. Hudson*, 265 Va. 505, 514 (2003)). "While no single piece of evidence may be sufficient, the combined force of many concurrent and related circumstances . . . may lead a reasonable mind irresistibly to a conclusion." *Pijor v. Commonwealth*, 294 Va. 502, 512-13 (2017) (quoting *Muhammad*, 269 Va. at 479). Moreover, "[b]y finding the defendant guilty, . . . the factfinder 'has found by a process of elimination that the evidence does not contain a reasonable theory of innocence.'" *James v. Commonwealth*, 53 Va. App. 671, 681 (2009) (quoting *Haskins v. Commonwealth*, 44

- 11 -

Va. App. 1, 9 (2004)). That conclusion "is itself a 'question of fact,' subject to deferential appellate review." *Id.*

Here, the record amply supports the trial court's finding that Durham was the perpetrator. First, Wilson's testimony established that Durham possessed a firearm and ammunition consistent with those used in the murder. Specifically, two months before the shooting, Wilson and Durham illegally purchased two Glock pistols from a sporting goods store. Moreover, photographs from Durham's cell phone and Instagram account depicted hands holding Glock pistols containing 9 mm, hollow point ammunition. Forensic analysis of the bullets and cartridge casings collected from the shooting established that they originated from a "Glock-type, firearm," and at least one bullet appeared consistent with "hollow point" ammunition.

Second, Wilson's testimony established that Durham had the opportunity to murder Poole on April 29 and attempted to conceal his criminal involvement. Shortly before the shooting, Wilson drove Durham to appellant's apartment, where he watched Durham speak to someone through appellant's bedroom window. After Durham returned to Wilson's car, they parked on the shoulder of Chippenham Parkway. Durham then exited the car and disappeared through the woods, traveling toward appellant's apartment before "running" back "less than thirty minutes" later to escape in Wilson's car. S*ee Jones v. Commonwealth*, 279 Va. 52, 57 (2010) (holding that "affirmative acts of falsehood or flight immediately following the commission of a crime" are probative of "a person's guilty knowledge of, and participation in, a criminal act" (citing *Turman v. Commonwealth*, 276 Va. 558, 565 (2008))). A few days later, Durham traveled to New York and disposed of the two Glock pistols that he and Wilson had illegally obtained two months prior, exhibiting Durham's efforts to avoid detection from which a jury could rationally infer his "consciousness of guilt." *See Palmer v. Commonwealth*, 14 Va. App. 346, 348-49 (1992) ("[I]t is today universally conceded that the fact of an accused's flight, escape from custody, resistance

to arrest, concealment, assumption of a false name, and *related conduct* are admissible as evidence of consciousness of guilt, and thus of guilt itself." (emphasis added)).

Finally, evidence from the 911 calls, canine tracking, and cell phone historical location data analysis corroborated Wilson's testimony and established Durham's opportunity to murder Poole. On the second 911 call, a resident described seeing a "heavy-set man" running past her window toward the woods behind appellant's apartment complex following a series of gunshots. Officers Painter and Rhodenizer's trained police dogs tracked human scent to signs of fresh "ground disturbance," leading the officers to conclude that the perpetrator had recently fled the scene through woods, up a hill, and onto the shoulder of Chippenham Parkway. Moreover, D'Errico's cellular location analysis corroborated those conclusions by establishing that Wilson's phone was in the vicinity of Ivy Walk apartments at the time of Poole's murder and traveled back and forth via Chippenham Parkway between Wilson's and appellant's apartments shortly thereafter. From the above evidence, a factfinder could rationally conclude that Durham "had the opportunity to murder" Poole and did so. *Edwards v. Commonwealth*, 68 Va. App. 284, 299 (2017) (affirming first-degree murder conviction where defendant's cell tower location records established his presence at crime scene at the time of victim's murder); *cf. Epperly v. Commonwealth*, 224 Va. 214, 233 (1982) (affirming first-degree murder conviction based on "dog tracking" evidence proving defendant's criminal agency).

Furthermore, the evidence proved that Poole's murder was "willful, deliberate, and premeditated." Code § 18.2-32. "Murder at common law is a homicide committed with malice, either express or implied." *Tizon v. Commonwealth*, 60 Va. App. 1, 11 (2012) (quoting *Pugh v. Commonwealth*, 223 Va. 663, 667 (1982)). "To premeditate means to adopt a specific intent to kill, and that is what distinguishes first and second degree murder." *Kirby v. Commonwealth*, 50 Va. App. 691, 700 (2007) (quoting *Remington v. Commonwealth*, 262 Va. 333, 352 (2001)).

- 13 -

"[E]vidence of a mortal wound inflicted by a deadly weapon with little or no provocation creates an inference from which the trier of fact may conclude that the killer acted with premeditation." *Morris v. Commonwealth*, 17 Va. App. 575, 578 (1994).

At trial, undisputed facts established that the perpetrator repeatedly shot Poole with a firearm as Poole sat unarmed in a parked vehicle, inflicting a "mortal wound" with "a deadly weapon with little or no provocation." *Id.* That evidence proved that Poole's killing was malicious and premeditated. *Cf. Goins v. Commonwealth*, 251 Va. 442, 467 (1996) (affirming first-degree murder convictions where the defendant killed defenseless family members with repeated gunshots). Accordingly, the Commonwealth's evidence established that Durham perpetrated Poole's first-degree murder, thus satisfying the first element of appellant's liability as an accessory before the fact.

> 2. The evidence sufficed to prove that appellant contrived with, instigated, and incited Durham to perpetrate Poole's first-degree murder and shared Durham's criminal intent.

Next, appellant argues that, "[e]ven assuming Durham was the shooter," appellant's criminal participation "remained speculative." She contends that the evidence failed to prove that she shared or even knew of Durham's criminal intent. Additionally, appellant asserts that because the Commonwealth presented "no direct evidence prov[ing] that [appellant] ever encouraged, requested, or even desired" Poole's murder, it failed to "negate the idea that Durham acted alone[.]" We disagree.

Here, the record established that appellant contrived with, instigated, and incited Durham to perpetrate Poole's first-degree murder and had reason to know of his criminal intent. Wilson testified that appellant and Durham were "real close" and shared a decade-long, "brother/sister-type relationship." One month before the shooting, Durham expressed a desire and willingness to kill at appellant's behest when, on March 23, 2018, he wrote on Instagram,

- 14 -

"Please lemme kill him, lol let me shoot him" and "Imma kill him," in response to appellant's disclosure that a man had raped her. Thus, appellant "[had] reason to know" that Durham wanted and intended to perform criminal acts of violence at her request if incited through allegations of sexual assault. *McGhee*, 221 Va. at 427 (citing Perkins, *supra*, at 600).

Later, appellant testified before a grand jury that two days before the shooting, on April 27, 2018, Poole had raped her inside of his car at her apartment complex. Additionally, appellant's Instagram records from April 29 demonstrated that mere hours before Poole's murder, appellant wrote, "Me getting raped," when asked, "What is the one thing you wish never happened?" That evidence supplied the jury with compelling evidence of appellant's motive to facilitate Poole's murder. *See Aldridge v. Commonwealth*, 44 Va. App. 618, 656 (2004) (holding that "although 'motive is not an essential element of the crime, it is relevant and often most persuasive upon the question of the actor's intent'" (quoting *Epperly v. Commonwealth*, 224 Va. 214, 232 (1982)).

Moreover, the same day Poole allegedly raped appellant, she called Durham and caused him to become "frantic" with anger, drive to her apartment to speak privately with her, and exit her bedroom shortly thereafter, exclaiming, "I'm gonna kill that nigger." A jury could rationally conclude from that evidence that appellant told Durham that Poole had raped her, thus "inducing" Durham to predictably respond by expressing his intent to kill Poole in retribution and, two days later, act on that intent by murdering Poole. *Cf. McGhee*, 221 Va. at 428 (affirming defendant's conviction for first-degree murder of her husband where she induced a friend to kill on her behalf through repeated encouragement).

Furthermore, the record established that appellant not only instigated Poole's murder by inciting Durham to kill, but she also lured Poole to her apartment complex to create an opportunity for Durham to do so. Appellant admitted to police that she and Poole had been

- 15 -

"texting and calling back and forth" the weekend of his murder. And Poole's girlfriend testified that Poole seemed "standoffish" that weekend and, approximately one hour before the shooting, Poole left her apartment in his gold Taurus after receiving "a message or something [on] his phone[.]" Moreover, despite appellant's claim that Poole allegedly raped her on April 27, appellant told police that on April 29 she arranged with Poole to "sneak" out of her bedroom window "to hang out" with him while "her mother was out of the house," but abandoned the plan when her mother returned unexpectedly. Shortly afterward, appellant "heard gunshots . . . outside her window." That evidence collectively supports the rational inference that after Poole allegedly sexually assaulted her, appellant enticed Poole to meet her at her apartment complex so that Durham could murder him in the parking lot. *Cf. Wolfe v. Commonwealth*, 265 Va. 193, 214-15 (2003) (affirming conviction for murder-for-hire plot where defendant lured the victim to his girlfriend's apartment so his confederate could murder him). The jury was entitled to "discount" appellant's alternative, "self-serving explanation" to police as an effort at "lying to conceal [her] guilt." *Shackleford v. Commonwealth*, 262 Va. 196, 209 (2001).

Additionally, the jury could infer appellant's "consciousness of guilt" from her admitted destruction of evidence on her cell phone and social media accounts. *Jones*, 279 Va. at 57 (citing *Turman*, 276 Va. at 565). Appellant admitted to police that she had deleted her cell phone texts and Instagram messages with the victim "as soon as she . . . saw" the detectives waiting for her at her school, as confirmed by business records introduced at trial. Appellant also confessed that she performed a "factory reset" to remove the data from her cell phone before speaking to detectives. From such actions, the jury properly inferred appellant's "guilty knowledge of, and participation in" Durham's murder of Poole. *Id.*

Finally, we conclude that appellant's reliance on *Jones*, 208 Va. 370, is misplaced. In *Jones*, our Supreme Court held that the evidence was insufficient to prove that the defendant

- 16 -

acted as a principal in the second degree to a robbery committed by his codefendant in the course of a burglary. *Id.* at 373-74. Despite Jones' presence during the robbery and subsequent flight from police, the Supreme Court held that the evidence failed to prove his guilt as a principal in the second degree to robbery because Jones' presence alone was insufficient to prove any "overt act in furtherance" of the robbery necessary for conviction. *Id.* The Court did not address whether the evidence sufficed to prove Jones' guilt as an accessory before the fact. Consequently, *Jones* is inapposite to the case at bar, as we address a wholly-distinct, alternative theory of accomplice liability.

In conclusion, based on the evidence submitted, a jury could reasonably determine that the defendant "instigated the commission of" Poole's murder, that "she had reason to know" of Durham's criminal intention and "intended to encourage his commission of the crime," and that her encouragement in fact "induced" Durham to murder Poole. *McGhee*, 221 Va. at 428. *Jones* is inapposite because it addresses a distinct theory of accomplice liability that we need not consider, as the evidence was sufficient to prove that appellant was an accessory before the fact to Poole's first-degree murder. Accordingly, the trial court's ruling denying appellant's motion to strike was not plainly wrong or without evidentiary support.

   B. The trial court did not abuse its discretion in admitting Commonwealth's Exhibit 56.

Appellant contends that the messages contained in Commonwealth's Exhibit 56 were irrelevant because they were too "remote to the crime at hand" since they "did not occur within the time-frame [appellant] knew [the victim]." We disagree.

This Court reviews "a circuit court's decision to admit or exclude evidence under an abuse of discretion standard and, on appeal, will not disturb a circuit court's decision to admit evidence absent a finding of abuse of that discretion." *Herndon v. Commonwealth*, 280 Va. 138, 143 (2010). "In evaluating whether a trial court abused its discretion," we do "not substitute our

judgment for that of the trial court. Rather, we consider only whether the record fairly supports the trial court's action." *Grattan v. Commonwealth*, 278 Va. 602, 620 (2009) (quoting *Beck v. Commonwealth*, 253 Va. 373, 385 (1997)). "Only when reasonable jurists could not differ can we say an abuse of discretion has occurred." *Du v. Commonwealth*, 292 Va. 555, 564 (2016) (quoting *Grattan*, 278 Va. at 620).

"Evidence is relevant in the trial of a case if it has any tendency to establish a fact which is properly at issue." *Wise v. Commonwealth*, 6 Va. App. 178, 187 (1988) (citing *Johnson v. Commonwealth*, 2 Va. App. 598, 601 (1986)). "When the probative value of evidence sought to be admitted outweighs any prejudicial effect, and no other objection is pertinent, the evidence is admissible." *Id.* at 187-88 (citing *Coe v. Commonwealth*, 231 Va. 83, 87 (1986)). "The scope of relevant evidence in Virginia is quite broad, as '[e]very fact, *however remote* or insignificant, that tends to establish the probability or improbability of a fact in issue is relevant.'" *Jones v. Commonwealth*, 71 Va. App. 70, 88-89 (2019) (emphasis added) (quoting *Commonwealth v. Proffitt*, 292 Va. 626, 634 (2016) (alteration in original)).

Here, Commonwealth's Exhibit 56 demonstrated that one month before Poole's murder, appellant sent Durham an Instagram message stating, "I should say [a man] raped me," to which Durham replied, "Please lemme kill him, lol let me shoot him . . . Let's shoot him," and "Imma kill him." Based on those messages, the jury could infer that appellant knew that a claim of sexual assault could induce Durham to volunteer to perform criminal acts of violence at her behest. Those messages were therefore relevant and admissible to demonstrate Durham's protective relationship with appellant and to establish that appellant "knew or had reason to know" of Durham's criminal intent when she later communicated a similar rape allegation to him specifically regarding Poole. *McGhee*, 221 Va. at 425-26.

Appellant's contention that the exchange was too temporally remote from the incident is meritless, as "[e]very fact, *however remote or insignificant*, that tends to establish the probability or improbability of a fact in issue is relevant." *Jones*, 71 Va. App. at 88-89 (emphasis added) (quoting *Proffitt*, 292 Va. at 634 (alteration in original)); *cf. Wise,* 6 Va. App. at 188 (finding admissible at a robbery trial a strand of fake hair, aviator sunglasses, and a pistol found in the defendant's car five months after a robbery where the perpetrator had a similar gun and disguise).

Finally, we decline to consider appellant's additional evidentiary arguments because she failed to preserve them for appellate review. For the first time on appeal, appellant contends that (1) the messages were also irrelevant because they "were not about Poole," and (2) the messages were unduly prejudicial because they portrayed appellant "as a participant in a 'conversation' showing Durham's depravity or supposed criminal propensity."

Rule 5A:18 provides that "[n]o ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable this Court to attain the ends of justice." Accordingly, "this Court 'will not consider an argument on appeal [that] was not presented to the trial court.'" *Farnsworth v. Commonwealth*, 43 Va. App. 490, 500 (2004) (quoting *Ohree v. Commonwealth*, 26 Va. App. 299, 308 (1998)). Moreover, appellate courts "will not consider an argument that differs from the specific argument presented to the trial court, even if it relates to the same general issue." *Edwards v. Commonwealth*, 41 Va. App. 752, 761 (2003) (*en banc*) (citing *Floyd v. Commonwealth*, 219 Va. 575, 584 (1978)). "Specificity and timeliness undergird the contemporaneous-objection rule [and] animate its highly practical purpose." *Bethea v. Commonwealth*, 297 Va. 730, 743 (2019) (quoting *Dickerson v. Commonwealth*, 58 Va. App. 351, 356 (2011)); *Brown v. Commonwealth*, 279 Va. 210, 217 (2010). "Not just any objection will do. It must be both specific and timely—so that the

trial judge would know the particular point being made in time to do something about it." *Bethea*, 297 Va. at 743.

At trial, appellant never argued that Exhibit 56 was inadmissible because the risk of the jury drawing impermissible character inferences from it rendered the evidence unfairly prejudicial. Instead, appellant asserted broad, general objections based on "relevance" and "undue prejudice" that were insufficient to preserve her more specific evidentiary challenges for appellate review. *See Edwards*, 41 Va. App. at 760 ("A general argument or an abstract reference to the law is not sufficient to preserve an issue." (citing *Floyd*, 219 Va. at 584)). Accordingly, Rule 5A:18 forecloses our review of the arguments that appellant raises for the first time on appeal. *Id.* at 761. Although there are exceptions to Rule 5A:18, appellant has not invoked them, and the Court will not do so *sua sponte*. *Id.*

## III. CONCLUSION

For the foregoing reasons, we affirm appellant's conviction.

*Affirmed*.